EMMY MERTZ, Appellant, *v.* FRED MERTZ, Respondent.

(Argued June 3, 1936; decided July 8, 1936.)

*Israel Hoffman* and *David Steckler* for appellant.

*Irving I. Goldsmith, Monroe Collenburg, Frank Rashap* and *Joseph L. Roesch* for respondent.

LEHMAN, J. The plaintiff has brought an action in this State against her husband to recover damages for personal injuries which, she alleges, she sustained in the State of Connecticut through her husband's negligent operation of an automobile, owned and controlled by him. Under the law of New York the rule is well established that a husband is not liable to his wife for personal injuries caused by his negligence. (*Schultz* v. *Schultz*, 89 N. Y. 644; *Allen* v. *Allen*, 246 N. Y. 571.) The complaint alleges that under the law of the State of Connecticut a husband is liable for such injuries. The parties are residents of the State of New York. The problem presented upon this appeal is whether a wife residing here may resort to the courts of this State to enforce liability for a wrong committed outside of the State, though under the laws of this State a husband is immune from such liability.

"A trespass, negligent or willful, upon the person of a wife, does not cease to be an unlawful act though the law exempts the husband from liability for the damage." The immunity of the husband is based upon the common law doctrine of the merger of the beings of husband and wife in the unity of marriage. Each spouse is disabled under our law from maintaining an action against the other for personal injuries. (*Schubert* v. *Schubert Wagon Co.*, 249 N. Y. 253, 256.) We are told that the rule " exists merely as a product of judicial interpretation, is

vestigial in character, and embodies no tenable policy of morals or social welfare." That is a strong indictment of the existing law, and if true calls for change in the law. In spite of such arguments, this court has held that the rule of law exists by tradition and authority, and change, if any, must be made by the Legislature. " We are not at liberty to extend it by dubious construction." (*Schubert* v. *Schubert Wagon Co.*, *supra*, p. 258.) It is equally true that we are not at liberty to disregard it as long as it remains part of the law of the State.

The Legislature of Connecticut has chosen to remove the common law disability. There a wife may maintain an action against her husband for damages caused by his wrong and no exception has been engrafted there upon the general rule that "illegality established, liability ensues." The sovereign power of each State is coterminous with its territorial limits. Its law alone determines what acts may be performed there with impunity and from what acts liability enforceable in its courts shall flow. The law of one State has in other jurisdictions such force only as is lent to it by the law of such jurisdiction. A cause of action for personal injuries is transitory. Liability follows the person and may be enforced wherever the person may be found. None the less, a cause of action arising in one State may be enforced in another State only by the use of remedies afforded by the law of the forum where enforcement is sought. The courts of the State of New York are not concerned with the wisdom of the law of Connecticut or of the internal policy back of that law. They must enforce a transitory cause of action arising elsewhere, unless enforcement is contrary to the law of this State. So we have said, " The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some

deep-rooted tradition of the common weal." (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 111.)   (Cf. American Law Institute, Restatement of the Law of Conflict of Laws, § 612.)

We have said again and again, as we did in *Loucks* v. *Standard Oil Co.* (*supra*), that rights may not be granted or withheld by our courts " at the pleasure of the judges, to suit the individual notion of expediency and fairness." When the court said further in that case that the test of a right to resort to the courts of this State for enforcement of a foreign right exists " unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep rooted tradition of the common weal," the court did not and could not have intended to formulate a standard measured by " individual notion of expediency and fairness " or, indeed, by any standard other than the law of the forum.   Judicial decision has heretofore been confined to the formulation of rules of law and their application to the facts of a particular case.   Notions of expediency and justice which at times we call " public policy " may exercise a controlling influence in the development of law.   Indeed as Judge CROUCH has pointed out in his opinion, " back of every law is something which is conventionally referred to as public policy."   Law written in constitution or statute is fixed.   The courts must interpret the writing; they may not disregard the law as written.   Its validity does not depend upon whether the public policy behind it is strong or weak, sound or unsound.   It must always control judicial decision.   Only the unwritten law resting upon judicial precedent is plastic.   There, in reaching decision, the courts must, at times, formulate a new rule of law where statutes or earlier decisions furnish no sure guide. How far judicial decision then may be dictated by individual notion of expediency and justice has been the subject of much discussion.   Upon one point all agree. The courts must always endeavor to apply to the facts

of a particular case a general rule of law which they find expressed in statute or judicial decision or which they formulate to meet new conditions; and even in formulating a rule individual notion of public policy may be given effect only where the court finds that its notion of public policy is so generally held and so obviously sound that it is in fact a part of the law of the State.

" The term ' public policy ' is frequently used in a very vague, loose or inaccurate sense. The courts have often found it necessary to define its juridical meaning, and have held that a State can have no public policy except what is to be found in its constitution and laws. ( *Vidal* v. *Gerard's Exr.*, 2 How. [U. S.] 127; *Hollis* v. *Drew Theological Seminary*, 95 N. Y. 166; *Cross* v. *U. S. T. Co.*, 131 N. Y. 343; *Dammert* v. *Osborn*, 140 N. Y. 40.) Therefore, when we speak of the public policy of the State, we mean the law of the State, whether found in the Constitution, the statutes or judicial records." (*People* v. *Hawkins*, 157 N. Y. 1, 12.) We have reiterated that definition in *Straus & Co.* v. *Canadian Pacific Ry. Co.* (254 N. Y. 407, at p. 413). There is nothing in the opinion in *Loucks* v. *Standard Oil Co.* (*supra*) which could indicate that in the field of conflict of laws the " juridical meaning " of the vague concept of public policy is different.

In that case the administrator of a resident of this State who was killed in Massachusetts sued here to recover the damages caused by his death. In Massachusetts, as in New York, statutes have created a cause of action for death caused by wrongful act. The remedies are not in all respects alike. In Massachusetts there are limitations upon a recovery which are not contained in the New York statute. Nevertheless in each State the statute provides a remedy through suit by the administrator and no public policy to be found in the " Constitution, the statutes or judicial records " of this State, no " fundamental principle of justice," no " prevalent conception of good morals " or " deep-rooted tradition of the common weal " precluded the administrator from enforcing, in our

courts, by the remedy available under our law, the cause of action arising in Massachusetts for wrong committed there. This court then held only that in such case the courts may not read into the law a limitation created by a supposed public policy, founded on its own notion of expediency and justice. It did not hold that the courts might disregard a limitation, contained in the law of the State, established by authority and tradition, because the court could not discern a sound public policy back of the law.

The law of the forum determines the jurisdiction of the courts, the capacity of parties to sue or to be sued, the remedies which are available to suitors and the procedure of the courts. Where a party seeks in this State enforcement of a cause of action created by foreign law, he can avail himself only of the remedies provided by our law, and is subject to the general limitations which are part of our law. So we pointed out in *Loucks* v. *Standard Oil Co.* (*supra*) and the same rule is generally applied in all other jurisdictions. "If no form of action is provided by the law of a State for the enforcement of a particular foreign right, no action to enforce that right can be maintained in the State." (Restatement of Law of Conflict of Laws, § 608.) Our courts are not concerned with the internal policy of the State which created the cause of action. They are concerned solely with the law of this State which determines the jurisdiction of its courts and the remedies that may be accorded here. The law of this State attaches to the marriage status a reciprocal disability which precludes a suit by one spouse against the other for personal injuries. It recognizes the wrong but denies remedy for such wrong by attaching to the person of the spouse a disability to sue. No other State can, outside of its own territorial limits, remove that disability or provide by its law a remedy available in our courts which our law denies to other suitors. So we said in *Herzog* v. *Stern* (264 N. Y. 379). A disability to sue

which arises solely from the marital status and which has no relation to a definition of wrong or the quality of an act from which liability would otherwise spring, may perhaps be an anachronistic survival of a common law rule. Even then, the courts should not transform an anachrony into an anomaly, and a disability to sue attached by our law to the person of a wife becomes an anomaly if another State can confer upon a wife, even though residing here, capacity to sue in our courts upon a cause of action arising there.

The judgment should be affirmed, with costs.

CROUCH, J. (dissenting). The plaintiff and defendant, residents of New York, are wife and husband. The action is for personal injuries sustained, through the defendant's gross negligence, by the plaintiff in Connecticut while a passenger in defendant's automobile. The complaint alleges that by the law of Connecticut a wife, under such circumstances, may maintain an action against a husband. The Appellate Division affirmed a judgment dismissing the complaint for insufficiency and lack of jurisdiction. It was held that " the cause of action asserted offends our public policy to so great an extent that the court is without jurisdiction to entertain it."

Without pausing to inquire whether the word " jurisdiction " was accurately used, we accept it as a convenient symbol applying to a refusal to enforce a claim created by a foreign law. In approaching the question whether the refusal was justified, certain general principles may be dogmatically stated. The cause of action rests primarily upon the law of Connecticut. If we entertain it, whether we say we are enforcing the original foreign law or a copy of it incorporated in our own rule of conflicts, is immaterial as a practical matter. It is not penal; it is transitory; and our courts will enforce it according to the substantive law of Connecticut unless it " is contrary to the strong public policy " of our own State. (Restatement of Law of Conflict of Laws, § 612.) We are left, then, to

determine whether the law of Connecticut, which permits a wife to sue a husband for personal injuries, is contrary to some strong public policy of New York.

The public policy concept is a vague and variable phenomenon. When we find it necessary, in a general way, to embody it in words, we are apt to resort to the language used in *People* v. *Hawkins* (157 N. Y. 1, 12), and say that when we use the term " we mean the law of the State, whether found in the Constitution, the statutes or judicial records." We go further, sometimes, and in explanation say that the law so found evidences " the will of the Legislature " (*Straus & Co.* v. *Canadian Pacific Ry. Co.*, 254 N. Y. 407, 413), and so, perhaps, represents an inarticulate public opinion on the specific matter involved. In that broad sense it may be true to say that back of every law there is something which is conventionally referred to as public policy. Obviously, however, the bulk of public policy, so defined, relates to " minor morals of expediency and debatable questions of internal policy.". Hence, the difference between our own public policy and that of our sister States is for the most part disregarded by our own law of conflict of laws. In that field, the concept of public policy is greatly narrowed and specialized. *People* v. *Hawkins* (*supra*) was a non-conflict case. The " strong public policy," which alone serves to prevent the enforcement of foreign rights, must have relation to something which " in its nature offends our sense of. justice or menaces the public welfare." (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 110.) Our courts " do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of our common weal." (Id. p. 111.)

It may be freely conceded that back of the New York rule which withholds from the wife the right to sue the husband for personal injuries is a public policy of the kind which is back of every other rule of law. But neither in

the history of the rule nor in its operation is there anything to indicate that that policy is founded upon a definite view — or even upon some vague feeling — that justice or the public welfare would be affected by a contrary rule. There is no need again to trace the course of decision by which the rule as an exception became " engrafted upon " (*Schubert* v. *Schubert Wagon Co.*, 249 N. Y. 253, 258) what is now Domestic Relations Law (Cons. Laws, ch. 14), section 57. For that story and its consequences reference may be had to the opinion of POUND, J., in *Allen* v. *Allen* (246 N. Y. 571). It is enough to say that the rule exists merely as a product of judicial interpretation, is vestigial in character, and embodies no tenable policy of morals or of social welfare. To urge that it survives because it is an aid to conjugal peace disregards reality. Conjugal peace would be as seriously jarred by an action for breach of contract, or on a promissory note, or for an injury to property, real or personal, all of which the law permits, as by one for personal injury. In short, even though we assume that there is some shadowy element of policy back of the rule, it should give way to " the controlling public policy * * * that the courts of each State shall give effect to all valid causes of action created by the laws of another State except possibly in extreme cases." (HUBBS, J., in *Herzog* v. *S'ern*, 264 N. Y. 379, 387; cf. Restatement of Law of Conflict of Laws, § 612, comment (c); 44 Yale Law Journal, 158.)

Resort to precedent in cases involving the doctrine of public policy is seldom useful. (Cf. Goodhart, Essays in Jurisprudence and The Common Law, p. 67.) *Herzog* v. *Stern* (*supra*) is not in conflict with the view herein expressed. The decision there went on the ground that each sovereign has complete control of the devolution and administration of the property of a deceased resident, and, since our own statutory scheme expressly excluded the claim sought to be enforced, our courts were without jurisdiction. There was, therefore, no room for any

consideration of the question of public policy (p. 384), though the view was expressed *obiter* that the same conclusion might be reached on that ground.

The judgment should be reversed, with costs in all courts.

CRANE, Ch. J., O'BRIEN, HUBBS and LOUGHRAN, JJ., concur with LEHMAN, J.; CROUCH, J., dissents in opinion, in which FINCH, J., concurs.

Judgment affirmed.